PREET BHARARA
United States Attorney
By: ELLEN LONDON
Assistant United States Attorney
86 Chambers Street, 3rd Fl.
New York, NY 10007
Tel.: (212) 637-2737
Fax: (212) 637-2702
Email: ellen.london@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA ex rel.  :
JOHN DOE,                         :
                                  :
                Plaintiff,        :
                                  :
        v.                        :
                                  :
LOCAL 95, DC 1707-AFSCME,         :
AFL-CIO and DISTRICT COUNCIL      :
1707, LOCAL 95 HEAD START         :
EMPLOYEES WELFARE FUND,           :   11 Civ. 1287 (WHP)
                                  :
                                  :   COMPLAINT-IN-INTERVENTION OF
                                  :   THE UNITED STATES OF AMERICA
                Defendants.       :
------------------------------------------------------------X   JURY TRIAL DEMANDED
UNITED STATES OF AMERICA,         :
                                  :
                Plaintiff,        :
                                  :
        v.                        :
                                  :
DISTRICT COUNCIL 1707, LOCAL 95   :
HEAD START EMPLOYEES              :
WELFARE FUND,                     :
                                  :
                                  :
                Defendant.        :
------------------------------------------------------------X



Plaintiff United States of America (the "United States" or the "Government"), by

its attorney, Preet Bharara, United States Attorney for the Southern District of New York, alleges upon information and belief as follows:

## INTRODUCTION

1. This is a civil fraud lawsuit by the United States to recover damages and penalties from defendant District Council 1707, Local 95 Head Start Employees Welfare Fund ("Defendant" or the "Fund") under the False Claims Act and common law arising from Defendant's fraudulent practice of seeking reimbursement for certain insurance costs at a higher amount than it actually paid for those insurance costs.

2. As described more fully below, the Fund administers hospitalization insurance for employees who work on Head Start programs. Head Start is a federal program that provides grants to local public and private non-profit and for-profit agencies to provide comprehensive child development services to economically disadvantaged children and families. As a part of administering the hospitalization insurance, Defendant negotiates premium rates with Empire Blue Cross Blue Shield ("Empire"). After receiving Empire's invoices each month, the Fund seeks reimbursement for the premium amounts from the New York City Administration for Children's Services ("ACS"), which pays the Fund using Head Start grant money.

3. During the relevant time period, Defendant repeatedly and falsely represented to ACS that it was paying 100% of hospitalization insurance premium costs when, in actuality and after subsequent settlements with Empire, it only paid approximately 95% of these costs. Accordingly, ACS forwarded more Head Start grant money for hospitalization insurance than the Fund actually paid to the insurance carrier, with the Fund improperly retaining the difference.

4. As a result of the fraud, Defendant obtained millions of dollars of federal grant

money to which it was not entitled.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, over the remaining claims pursuant to 28 U.S.C. § 1345, and over all claims pursuant to the Court's general equitable jurisdiction.

6. Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendant does business within this District.

## PARTIES

7. Plaintiff is the United States of America.

8. Defendant District Council 1707, Local 95 Head Start Employees Welfare Fund is a fund that provides benefits to over 2,000 Head Start employees, and is headquartered in New York City, with its principal offices located at 420 West 45th Street, 3rd Floor, New York, New York 10036.

## FACTUAL BACKGROUND

A. The Head Start Program in New York City

9. Head Start is a federal program that makes grants to local public and private non-profit and for-profit agencies to provide comprehensive child development services to economically disadvantaged children and families. The program is administered by the Administration for Children and Families ("ACF"), which is part of the United States Department of Health and Human Services ("HHS").

10. Head Start programs promote school readiness by enhancing the social and

3

cognitive development of children through the provision of educational, health, nutritional, social and other services to enrolled children and their families.

11. The New York City Administration for Children's Services has applied for and received Head Start discretionary grants for the past 47 years. For each of these years, ACS has submitted an Application for Federal Assistance to ACF, along with a proposed budget.

12. As a Head Start grantee, ACS annually serves approximately 19,000 children through approximately 74 agencies, colleges, and universities located throughout the five boroughs, known as "Delegate Agencies." The Delegate Agencies operate the Head Start program at the community level.

13. The employees of the Delegate Agencies are represented by District Council 1707, Local 95.

B.  Rules and Regulations Governing Head Start Grant Funds

14. ACF provides Head Start grantees a list of standard terms and conditions, which states that "[t]he attached Financial Assistance Award is subject to Federal legislation and to [HHS] and ACF regulations and policies."

15. The uniform administrative rules for federal grant awards to local governments, which applies to Head Start discretionary grants (such as the one provided to ACS), are set forth in the regulations codified at 45 C.F.R. § 92. These regulations provide that "Grant funds may be used only for . . . the allowable costs of the grantees . . ." 45 C.F.R. § 92.22. In addition, "[a] grantee must liquidate all obligations incurred under the award not later than 90 days after the end of the funding period" (or no later than a date allowed by the federal agency). 45 C.F.R. § 92.23. "Any funds paid to a grantee in excess of the amount to which the grantee is finally

4

determined to be entitled under the terms of the award constitute a debt to the Federal Government." 45 C.F.R. § 92.52.

16. "For each kind of recipient, there is a particular set of Federal principles that applies in determining allowable costs," and the "[a]llowability of costs shall be determined in accordance with the cost principles applicable to the entity incurring the costs." 45 C.F.R. § 74.27. The cost principles applicable to a local government grantee are set forth in OMB Circular A-87. 2 C.F.R. § 225.5. The circular provides that "[t]o be allowable under Federal awards, costs must meet the following general criteria:

   a.   Be necessary and reasonable for proper and efficient performance and administration of Federal awards.

   b.   Be allocable to Federal awards under the provisions of 2 CFR part 225.

   . . .

   e.   Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit.

   . . .

   j.   Be adequately documented."

17. ACS obtains a lump-sum grant amount at the beginning of the year, and draws down on this amount as necessary. ACS submits an annual financial status report to ACF that must account for any unliquidated obligations, which, as set forth above, are required to be liquidated within 90 days, subject to any extensions. The annual financial status report to ACF contains the following certification: "I certify to the best of my knowledge and belief that this report is correct and complete and that all outlays and unliquidated obligations are for the purposes set forth in the award documents."

5

18. ACS then submits a final financial status report (the SF 269), at which point all money should be reconciled for the year; the SF 269 includes the same certification as in the annual financial status report: "I certify to the best of my knowledge and belief that this report is correct and complete and that all outlays and unliquidated obligations are for the purposes set forth in the award documents."

19. The application for Head Start funding completed by ACS contains the following signed statement: "[T]o the best of my knowledge and belief, all data in this application are true and correct. The document has been duly authorized by the governing body of the applicant and the applicant will comply with the attached assurances if the assistance is awarded." The attached assurances provide that the recipient will comply with the federal laws, executive orders, regulations and policies governing the program, which include the cost principles set out above.

C. Health Insurance for Head Start Employees

20. ACS uses its Head Start grant money to pay insurance costs for the employees of the Delegate Agencies carrying out the Head Start programs.

21. New York City's Central Insurance Program ("CIP"), which is a part of the Mayor's Office, administers the major medical insurance provided to these employees.

22. The Fund administers the hospitalization insurance provided to the employees. Specifically, the Fund negotiates rates with Empire Blue Cross Blue Shield ("Empire") for the hospitalization insurance, and pays Empire according to a contract negotiated on an annual basis.

23. The Fund sends invoices to ACS to be reimbursed for the costs of hospitalization insurance on a monthly basis.

6

24.     In addition to paying for the hospitalization insurance costs, ACS also pays the Fund a 1.5% administrative fee for administering the hospitalization insurance. The Fund includes this fee in its monthly invoices to ACS.

## THE FRAUDULENT SCHEME

25.     Prior to 2008, the Fund and Empire had in place a retrospective billing arrangement for the hospitalization insurance. Pursuant to this arrangement, the Fund agreed to pay a certain amount in premiums at the beginning of each year, and to settle any unused portion of the hospitalization insurance with Empire at the end of the year by accepting from Empire a payment for any excess premiums paid. If the hospitalization insurance costs were higher than the negotiated premium amount, Empire recovered the difference from the Fund by deducting it from any settlement amount owed to the Fund the following year. In other words, the Fund never paid more than the negotiated 100% amount, but was entitled to pay less than that amount depending on the utilization for the year.

26.     In addition, Empire provided the Fund with a point-of-charge ("POC") service as a part of the retrospective funding arrangement, pursuant to which Empire allowed the Fund to pay some percentage of the premium amount (typically 95%) on a monthly basis, with the understanding that Empire would be made whole during the year-end settlement process. This POC service was intended to serve as a cash-flow benefit to the Fund.

27.     The Fund thus received monthly invoices from Empire for approximately 95% of the monthly hospitalization insurance premium amount.

28.     However, instead of passing the Empire invoices on to ACS for payment, the Fund submitted invoices for ACS based on the 100% monthly premium amount, as opposed to

7

the lesser percentage (usually 95%) that the Fund was actually paying Empire.

29. The Fund's invoices also included the 1.5% fee, based on the 100% monthly amount, as opposed to the amount actually billed.

30. The Fund did not provide ACS with the Empire invoice, nor did the Fund inform ACS that it was charging ACS a different amount than it was paying Empire on a monthly basis.

31. At the end of each year, when the Fund settled with Empire, the Fund did not return any money that it received from Empire to ACS.

32. Nor did the Fund inform ACS when it received refunds from Empire as part of the settlement process.

33. For example, in 2006, the Fund invoiced ACS $11,120,966.09 for the year for hospitalization insurance. The Fund paid Empire $10,634,995.73 for the year; thus, $485,970.36 was deferred during the year. At settlement, Empire refunded $421,549.37 to the Fund. Accordingly, after Empire recouped the point-of-charge percentage amount, for 2006 there was a $907,519.73 difference between the premium amount invoiced to ACS and the amount that the Fund actually paid to Empire.

34. Between 2000 and 2007, the Fund paid 100% of the premium amount on only two occasions. On average, the Fund paid approximately 95% of the premium amount that it billed to ACS.

35. These practices led to an overpayment by ACS of millions of dollars, all of which were Head Start funds.

36. In making these overpayments, the Fund caused ACS to make false statements to ACF that ACS was using the Head Start grant money properly.

## FIRST CLAIM

**Violations of the False Claims Act: Presentation of False Claims**
**(31 U.S.C. § 3729(a)(1) (2006))**

37.     The United States incorporates by reference paragraphs 1- 36 as if fully set forth in this paragraph.

38.     The United States seeks relief against Defendant under Section 3729(a)(1) (2006) of the False Claims Act, 31 U.S.C. § 3729(a)(1).

39.     As set forth above, in connection with the foregoing schemes, Defendant knowingly, or with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payment to ACS, a receipient of federal funds, and such funds were spent or used by ACS on ACF's behalf and to advance ACF's interest.

40.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## SECOND CLAIM

**Violations of the False Claims Act: Making or Using a False Record or Statement**
**(31 U.S.C. § 3729(a)(2)(2006))**

41.     The United States incorporates by reference paragraphs 1- 36 as if fully set forth in this paragraph.

42.     The United States seeks relief against Defendant under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2).

43.     As set forth above, in connection with the foregoing schemes, Defendant knowingly, or in reckless disregard for the truth, made, used, and caused to made and used, false

9

records and statements material to a false and fraudulent claim that was made to ACS, a receipient of federal funds, and such funds were spent or used by ACS on ACF's behalf and to advance ACF's interest.

44.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as requird by law for each violation.

### THIRD CLAIM

### Violations of the False Claims Act: Use of False Statements
### (31 U.S.C. § 3729(a)(7) (2006))

45.     The United States incorporates by reference paragraphs 1- 36 as if fully set forth in this paragraph.

46.     The United States seeks relief against Defendant under Section 3729(a)(7) (2006) of the False Claims Act, 31 U.S.C. § 3729(a)(7).

47.     As set forth above, in connection with the foregoing schemes, Defendant knowingly, or in reckless disregard for the truth, made, used, or caused to be made and used, false records and statements in order to conceal, avoid, or decrease the obligation to return money or property to the United States.

48.     By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## FOURTH CLAIM

### Unjust Enrichment

49. The United States incorporates by reference paragraphs 1- 36 as if fully set forth in this paragraph.

50. By reason of the payments to defendants, Defendant was unjustly enriched. The circumstances of Defendant's receipt of the payments are such that, in equity and good conscience, Defendant should not retain these payments, the amount of which is to be determined at trial.

## FIFTH CLAIM

### Common Law Fraud

51. The United States incorporates by reference paragraphs 1- 36 as if fully set forth in this paragraph.

52. Defendant made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with the claims for payment submitted by, or on behalf of, Defendant to the United States.

53. Defendant intended that the United States rely upon the accuracy of the false representations referenced above.

54. The United States made substantial payments of money in justifiable reliance upon Defendant's false representations.

55. Defendant's actions caused the United States to be damaged in a substantial amount to be determined at trial.

## SIXTH CLAIM

### Payment Under Mistake of Fact

56.     The United States incorporates by reference paragraphs 1- 36 as if fully set forth in this paragraph.

57.     The United States seeks relief against Defendant to recover monies paid under mistake of fact.

58.     ACF disbursed funds based on invoices submitted by Defendant to ACS under the erroneous belief that Defendant's invoices were true.

59.     Because of these payments by mistake, Defendant has received monies to which it is not entitled.

60.     By reason of the foregoing, the United States was damaged in a substantial amount to be determined at trial.

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor and against Defendant as follows:

(a) On the First, Second and Third Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)), for treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented;

(b) On the First, Second and Third Claims for Relief, an award of costs pursuant to 31 U.S.C. § 3729(a);

(c) On the Fourth, Fifth and Sixth Claims for Relief, in an amount to be determined at trial, together with costs and interest; and

(d) awarding such further relief as is proper.

Dated: New York, New York
July 26, 2012

By: *[signature]*

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for Plaintiff
United States of America

ELLEN LONDON
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2737
Facsimile: (212) 637-2702
ellen.london@usdoj.gov